RUFUS GREENE & CO. *v.* MARK H. HASKELL & others.

M. H. H., first a supercargo, or clerk, and afterwards a resident agent, at Aden, in Arabia, of R. G. & Co. who were engaged in the African trade, without authority invested the funds of his principals, together with his own, in twelve tusks of ivory, which he purchased in his own name, and brought home with him in a vessel of his principals, and entered at the custom-house as his own property. Upon ascertaining that their funds, which should have been paid over by M. H. H. to their general agents at Zanzibar, had been invested in the ivory, R. G. & Co. refused to permit M. H. H. to remove it from their storehouse, where it was stored with the rest of the cargo of their vessel, without first accounting to them for their funds; whereupon, M. H. H. procured his father, M. H., to whom he was indebted, to attach it for his debt, and subsequently to levy upon it the execution issued upon a judgment by default, for the debt. Upon a bill filed by R. G. & Co. for an injunction against the sale under the execution, and for their proportion of the ivory or its proceeds; *Held*, that the sale should be perpetually enjoined, and the ivory sold by a master; and that R. G. & Co. were entitled to elect whether they would take their proportion of the proceeds of sale, ascertained by the proportion which the amount of their funds invested in the ivory bore to its prime cost, or that amount, with interest from the time when it should have been paid over to their agents at Zanzibar. *Held, also*, that as the principal respondents were out of the jurisdiction, and the plaintiffs had no other security for their costs, the same should be paid out of the respondent's portion of the proceeds of the ivory.

An execution creditor stands in no better position in a court of equity than his debtor, as to property levied upon, to which the claimant in the suit has an equity prior to that of the debtor; and especially, if he attaches with notice of the prior equitable claim, and with a view to defeat it.

BILL IN EQUITY to declare and enforce the rights of the plaintiffs to twelve tusks of ivory, claimed by them to have been purchased on the coast of Africa by Mark H. Haskell, one of the defendants, and a trading agent of the plaintiffs, partly with their funds.

The plaintiffs, who did business in Providence, carried on from thence the African coast trade, as well through supercargoes or clerks, who accompanied their vessels to the coast, as through agencies established at Zanzibar, and elsewhere, upon it. In the spring of 1853, they took, as they claimed, the said Mark H. Haskell into their service, upon the following terms, contained in a paper, or memorandum, a copy of which, in the handwriting of Haskell, was retained by them; the original, in their handwriting, endorsed, " Agreement of Rufus Greene, Jr., April 23, 1853," being retained by Haskell.

" Mr. Mark H. Haskell goes out in schooner H. Fitzgerald,

vessel consigned to George R. Dwyer, at Mozambique, and Haskell & Cheney, at Zanzibar, to touch at Nes Bet, up, from thence to Zanzibar; after leaving Zanzibar for Madagascar, to act as supercargo, under such directions as Messrs. Haskell & Cheney may give, to procure gum copal and shell, to keep a particular account of all transactions; compensation to be three hundred dollars per year and expenses paid. After the trade with the schooner is done, or when found advisable, to go to Aden in some one of our vessels and stop ashore to transact business at $2\frac{1}{2}$ per cent. for sales, and $2\frac{1}{2}$ per cent. on purchases, and pay all his expenses of living and house here; liberty to ship home his commissions in ivory or produce of small bulk, also four hundred dollars more by taking his own funds out for investment, by any vessel belonging to same owners. It is expressly understood and agreed, that his faithful and best services to be devoted solely for the interest of Messrs. Greene & Arnold and their vessels, and no others.

Signed, RUFUS GREENE, Jr. for self, and copartners.
*April* 23, 1853.

" Send home accounts of all business and disbursements by every opportunity."

Haskell took with him, also, a letter of instructions from Rufus Greene, Jr. for owners, dated April 22, 1853, particularly directing him as to the H. Fitzgerald and her cargo until her arrival at Zanzibar, when it directed him to follow the instructions of Messrs. Haskell & Cheney in pursuing the voyage. Haskell proceeded with the H. Fitzgerald, and traded with her cargo on the coast, as directed. On the 9th of August, 1853, the plaintiffs wrote to him by another vessel of theirs, the barque Warren White, their letter closing thus :—" Should you find it best to go to Aden with the barque Warren White, you will do so, *acting as clerk until we get another vessel out with cargo consigned to you at that port.*" This letter Haskell received before January 12, 1854; for, on that day he replied from Zanzibar, giving an account of his transactions with the cargo of the H. Fitzgerald for the plaintiffs, and concluded thus: " As the schooner goes from here to Mozam-

bique, and as I understand there will be no further need of my services on board of her, I shall, according to your instructions, proceed to Aden in the Warren White." Haskell, accordingly, proceeded in the Warren White to Aden, and on the 22d of February, 1854, by a letter to the plaintiffs of that date, informed them of his arrival at that port, and in the course of his letter says, " I shall remain here until the barque returns from Bombay, and if the climate agrees with my health, *for such a length of time as may be mutually agreeable.*" Several letters passed between the plaintiffs and Haskell, whilst the latter remained at Aden, containing instructions as to purchases for their vessels, from the former to the latter, and the replies, advising them of what Haskell had done for them in this respect, and also of the state of the markets. On the 19th of May, 1854, Haskell wrote to the plaintiffs from Aden, amongst other things,—" The prospect is not very good here, and unless I receive some encouragement from you I shall return home by the next vessel which stops here." And again : " It will be useless for me to stay in Aden, unless you intend trading here to some extent." He remained, however, at Aden until April 28, 1855, acting, as occasion required, for the plaintiffs. On the 1st of September, 1854, the plaintiffs wrote to him from Providence,—" Matters with you at Aden being at arm's end somewhat, we think you had better take passage to Zanzibar, and place yourself under the direction of Winn & Cheney. As our affairs at Mozambique are quite unsatisfactory to us, they may require your services at Mozambique or Zanzibar. If they should not, it will be best that you come home by our first vessel, as the business at Aden is not encouraging to yourself or to us." To this Haskell replied by letter to the plaintiffs, dated October 25, 1854,—" Your letter of the 1st ult. came duly to hand; and although somewhat surprised at *its* contents, I was in no way disappointed, as I had already written regarding my prospects at this place, and informed you of my intention of leaving by the Parodi, or earliest opportunity, unless matters assumed a much more favorable aspect than I had reason to expect. Yours but confirmed my determination of getting home as soon as possible, regretting having

38 *

stopped so long, and sorry that as the Maryland will prob-
ably not come to Aden, I shall be obliged to await the arrival
of the Parodi; she being the next American vessel which
may be expected here. Had I received your letter a few weeks
earlier, I should have proceeded to Bombay or Zanzibar, as
opportunity offered, and thus have secured a passage in the
Maryland. Your orders shall be attended to and fulfilled as
exactly as circumstances will admit. There is but little doing
here at this time," &c. &c. The Parodi, which was a vessel
of the plaintiffs, arrived at Aden on the 28th of January, 1855,
as appeared by a letter of Haskell of the date of February 11,
1855, to the plaintiffs, consigned to him by the general agents
of the plaintiffs, Winn & Cheney of Zanzibar, to whom all the
vessels of the plaintiffs were first sent from Providence, and
who consigned them to such other agents of the plaintiffs as
they thought most expedient. In the above letter of February
11, 1855, Haskell wrote to the plaintiffs, that he should send
his "account, Dr. and Cr., by next opportunity, from time of
leaving home to date of arrival of the Parodi; also, all papers
relating to the Parodi's business at this place, before leaving
for Zanzibar;" and again, in his letter of 28th of February,
1855, that he had written to them "via Marseilles on the 11th
inst. and now send duplicates, and my private account from
time of leaving home, April 19, 1853, to date of arrival of
barque Parodi at this place, January 28, 1855. I trust you will
find it all correct; any further particulars required, will of course
be forthcoming on my arrival home." By this account ren-
dered, he had charged to the plaintiffs his wages at the rate of
$300 per year from the date of his leaving home, Salem, until
the arrival of the barque Parodi at Aden, together with all
his expenses, claiming a balance of $848.78. He sold the out-
ward and purchased the homeward cargo of the Parodi at
Aden, and by his accounts thereof, rendered to the plaintiffs,
charged on amount of both sales and purchases $2\frac{1}{2}$ per cent.
commissions; his compensation in wages and commissions
being regulated according to what was claimed to be the con-
tract between them and him by the plaintiffs, coupling the
memorandum dated April 23, 1853, and their letter to him, as

above, dated 9th of August, 1853, and his reply thereto dated January 11, 1854. Deducting the balance due to him on his private account, as rendered above, for wages and expenses, $848.78, from the amount stated by him to be due from him to the owners of the barque Parodi, in his general account rendered to the plaintiffs of his doings for that vessel, to wit: $1,612.19, left him indebted to the plaintiffs in the sum of $763.41, upon his departure in the Parodi from Aden. By his letter to the plaintiffs of April 28, 1855, the day before the Parodi sailed, he wrote, " All business is settled, and the balance of funds subject to order of Messrs. Winn & Cheney, at Zanzibar." Finding, upon his arrival in Zanzibar, that Messrs. Winn & Cheney had no employment for him there, or at Mozambique, he continued his homeward voyage in the Parodi; but instead of paying over to them the above balance of $763.41, he invested the same, together with other funds of his own, at Zanzibar and at Mozambique, in twelve tusks of ivory, invoiced in his own name at $1,295.11, and entered as his property at the custom-house on his arrival at Providence. Upon his attempt, on the 29th of October, 1855, to remove this ivory from their storehouse, the plaintiffs objected to the removal until his accounts with them were settled, and an attempt at settlement having failed, a note for $1,710.20, payable on demand to his father, Mark Haskell, dated October 24, 1855, was mailed by the latter at Salem on the 30th of October, 1855, to a friend at Providence, with directions to employ an attorney to attach the ivory, indicating its quantity, marks, and place of storage. The ivory was attached on this note at the suit of the father, the next day, October 31; the son leaving the city, because, as he stated, he had " no disposition to prevent the attachment being made;" and judgment having been entered thereon by default, the execution, issued thereon, was delivered to Charles E. Chaffee, a deputy sheriff, for service, who levied the same upon, and took possession of the whole of the ivory.

The bill was filed against both the Haskells, father and son, the officer who levied the execution, and the attorney who delivered the writ and execution to him for service, praying an

account and division of the twelve tusks of ivory, by sale or otherwise, and that the sale, under the levy of the above execution, might be enjoined.

The case was heard upon bill, answer, and proofs, the latter relating principally to the value of the agent's services at Aden, and of such agencies as the plaintiffs proposed to establish through him at Aden, with a view of showing, on the one side, that he had been inadequately, and on the other, fully compensated, for his services to the plaintiffs. The answer of Mark H. Haskell, the agent, denied that any money of the plaintiffs had been invested in the ivory ; but it was apparent, from his cross-examination as a witness, coupled with his answer and the other evidence, that he intended by his answer, that it did not, because he now claimed the balance, admitted by his accounts rendered to the plaintiffs to have been in his hands at the time he bought the ivory with it, and much more, to be due to him from the plaintiffs for services. Two of the plaintiffs, being examined as witnesses, swore, that he admitted to them, that he had invested their balance, in his hands, in the ivory ; and upon his own cross-examination as a witness, it appeared, that he had not paid over the balance to Messrs. Winn & Cheney, nor brought it home, otherwise than in the ivory.

*James Tillinghast*, for the plaintiffs, contended,

1st. That the evidence showed that the defendant, Mark H. Haskell, was in the employment of the plaintiffs as supercargo or clerk from the time of his leaving home, April 19, 1853, to the arrival of the Parodi at Aden, January 28, 1855, at a salary of $300 per annum and expenses, and after that time at a compensation to be wholly derived from $2\frac{1}{2}$ per cent. commissions on sales and purchases made by him for the plaintiffs.

2d. That Haskell was estopped, by his correspondence and accounts rendered, from claiming any further compensation than in these he claimed, and from denying that he had funds of the complainants in his hands, as charged in the bill.

3d. That the funds of the complainants in Haskell's hands at the date of his sailing from Aden are conclusively shown to have been invested in the ivory, together with funds

of his own. Agents investing moneys of their principals in their own name, or mingling them with their own funds, are held to great strictness. Story on Agency, § 205; *Wren* v. *Kirton*, 11 Ves. 376; 1 Story, Eq. Jurisp. §§ 468, 623; *Hart* v. *Ten Eyck*, 2 Johns. Ch. R. 108. The complainants are entitled to have this ivory, or the proceeds of it upon sale, so divided, as to give them the original sum due, to them, $763.41, with interest at least from the arrival of the Parodi at Zanzibar on her homeward passage, or their proportion of the proceeds of sale due to their money invested in it, which would include profits, whichever shall prove to be most advantageous to them. *Dodge* v. *Perkins*, 9 Pick. 368; *Pope* v. *Barrett*, 1 Mason, 117; *Pease* v. *Greene*, 1 Jac. & Walk. 135; *Brown* v. *Southouse*, 3 Bro. Ch. 107. The costs of this proceeding should come out of the respondents' portion of the ivory or its proceeds, especially as the respondents are out of the jurisdiction, and there is no other security for them. *Pease* v. *Greene*, 1 Jac. & Walk. 141; *Collyer* v. *Dudley*, 1 Turn. & Russ. 421; S. C. 11 Eng. Cond. Ch. R. 229.

*B. F. Thurston*, for defendants, submitted, that the proof did not show that there was any special contract between the complainants and Mark H. Haskell for his services, as their agent at Aden, but that his compensation was to be equal to that of any other agency on the coast; that his accounts were rendered, at Aden, upon the supposition that he was to be retained as an agent in the employment of the plaintiffs, at Zanzibar or Mozambique, and that, in this way, the promises of the plaintiffs, upon the faith of which he had entered into their service, would have been fulfilled to him; whereas, he was informed, at Zanzabar, by Messrs. Winn & Cheney, the general agents there of the plaintiffs, that they had no employment for him. He also contended, upon the evidence, that no portion of the complainant's money was invested in the ivory; whereas, inasmuch as the ivory was entered at the custom-house with the knowledge of the complainants, and was subsequently attached by Mark Haskell upon a *bonâ fide* claim against his son, the plaintiffs should be held to strict proof of their title, to warrant the relief asked by the bill.

AMES, C. J.   The evidence read to us at the hearing does not permit us to doubt, that Mark H. Haskell engaged himself in the service of the plaintiffs, as their supercargo and clerk, in trading upon the African coast, and at Aden, in Arabia, at the rate of three hundred dollars per year and the expenses of living, until the arrival of the first vessel of the plaintiffs, consigned to him at the latter port; after which, he was to be compensated, by commissions only.   This clearly appears, from the memorandum of the terms upon which he was to serve, which he took with him, coupled with the letter of the plaintiffs to him, dated August 9, 1853, and his reply to it from Zanzibar, dated January 12, 1854, before he went to Aden. But, to put the matter beyond doubt, his accounts rendered to the plaintiffs from Aden, embracing his charges for his services from the time of his leaving Salem to join the vessel of the plaintiffs at Providence, to his sailing from Aden, are made up upon the basis that such was to be his compensation ; he charging three hundred dollars per year and his expenses for the time of service elapsing prior to, and during his residence at Aden, until the arrival of the Parodi, (the first vessel of the plaintiffs consigned to him,) and for the remainder of his service there, $2\frac{1}{2}$ per cent. commissions on her outward cargo sold, and homeward cargo purchased by him, precisely according to the memorandum and letters aforesaid.

By a comparison of these accounts rendered by him, it appears also, that he admitted himself, upon leaving Aden, indebted to the plaintiffs, as their agent, in the sum of $763.41, which, by his letter to the plaintiffs dated April 28, 1855, he stated was subject to the order of Messrs. Winn & Cheney, the general agents of the plaintiffs at Zanzibar.   Now, the only explanation which he attempts by his answer to make of these accounts, is, that at the time he rendered them he anticipated, from the plaintiffs' letter to him of the date of September 1, 1854, to be employed, after leaving Aden, by them, through Winn & Cheney, either at Zanzibar or Mozambique ; since, unless *thus* compensated, the plaintiffs would, by breach of the contract of service, be indebted to him in a much larger sum

than the balance of their funds, admitted by him to be in his hands subject to the order of their agents at Zanzibar.

There are insuperable difficulties in the way of this explanation. In the first place, it appears, that he *has* been compensated, and that too by his own retainer from the funds of the plaintiffs in his hands, precisely according to the contract made with him before going to Aden; and if, contrary to the tenor of his correspondence, he was disappointed at not receiving more and earlier consignments at Aden, he had no right to be; since no particular amount of consignments were stipulated by the plaintiffs to be made to him as their resident agent at Aden, and his accounts of the state of the market there were discouraging to the last degree. It is quite apparent, that he went to Aden at his own risk as to the amount of commissions he should receive there; that depending, necessarily, upon the opening for the plaintiff's trade which his own accounts of the market at that place would exhibit to them. There is not the least evidence of want of good faith on the part of the plaintiffs in inducing him to go to Aden; and if he remained there longer than was profitable, it must have been because he saw no chance of bettering his condition; since his letters, and the memorandum of contract show, the latter that he did not feel himself obliged, and the former that he *was not* obliged, to remain there a moment longer than a sense of his and the plaintiffs' interests prompted him. In the second place, we are not satisfied, from the proof, looking at the ordinary compensation received by clerks and agents in, that trade of no greater experience than himself, that he has not received all the compensation that he deserved, even if we were not precluded by the contract, and by his accounts rendered, as we are, from looking at that matter in the aspect of a *quantum meruit.*

Starting for Aden with this balance of the plaintiffs in his hands, the proof shows, that instead of paying it over, at Zanzibar, to the agents of the plaintiffs' agents there, as his letter of April 28, before referred to, admits was his duty, he invested it, with other moneys of his own, at Zanzibar and Mozambique, in twelve tusks of ivory, purchased in his own name; and subsequently, upon his arrival with it in the plain-

tiffs' vessel at Providence, entered it at the custom-house here, as his own property. We say this, because, although his answer denies that the ivory was purchased, in whole or part, with the funds of the plaintiffs, yet the assertion is evidently made upon the false notion that the plaintiffs were indebted to him for services beyond their balance in his hands; since, it is proved, that he admitted to two of the plaintiffs that this balance *was* invested by him in the ivory, and his own cross-examination as a witness shows, that he had not funds enough in hand, without applying this balance, to enable him to make the purchase. He has thus, contrary to his admitted duty, confounded the property of his employers with his own in the ivory purchased, and now, it being with the rest of the cargo of their vessel in the plaintiffs' storehouse, seeks, under cover of an attachment and levy, evidently made by his father as his creditor with his connivance, to wrest it from their possession, and to apply it to his exclusive use.

Under such circumstances what is the plaintiffs' equity? It is, as exemplified and illustrated by Lord Eldon in *Lupton* v. *White*, 15 Ves. 438–454, to have an injunction laid upon the whole property thus purchased, in order that they may have the utmost value of their unwilling venture in it. If it could not be ascertained what it cost, the whole of it would be theirs; as in case of the security, in *Panton* v. *Panton*, quoted by his lordship. We do not apprehend, however, that in the case before us, there is any difficulty in this respect; the proof showing the prime cost of the ivory, and the proportion which the balance of the plaintiffs' bears to that cost, showing the plaintiffs' interest in it. If that balance had been, as it should have been, paid over to the plaintiffs' agents at Zanzibar, it would have been, in the ordinary course of their business, invested in ivory or some other produce of that country, and sent to this, for sale. The fact that this agent of theirs, Mark H. Haskell, has, without authority, made a similar investment of their funds, should not deprive them of their chance of profits. They are entitled, therefore, to an election, which we shall require them to make before the sale, whether they will take their proportion of the proceeds of sale of the ivory, ascertained by the

proportion which their funds invested in it bears to its prime cost, or take, from the proceeds of sale, their balance invested in the ivory, with interest from the time of the Parodi's arrival at Zanzibar, which we believe was, as the proof ascertains, about the 15th of May, 1855.

As the respondents are without the jurisdiction, and there is no other security for the plaintiffs' costs here, we shall direct them to be paid out of Mark H. Haskell's proportion of the proceeds of the ivory, and the balance only, to be paid over to the levying officer for the satisfaction of the execution in his hands.

We have treated the attaching creditor's equity in this matter as no higher than that of his son, and debtor. It is evident that he made the attachment after notice of the claim of the plaintiffs, and, in connivance with his son, for the purpose of frustrating it. Under such circumstances, he is in no better condition, in this court, than his debtor; if, indeed, he would have been, had he attached without notice of the prior equity of the plaintiffs.

Unless, as suggested at the argument, the matter can be less expensively arranged by the parties, we must not only make the injunction against the sale of the ivory under the levy perpetual, but order it to be sold by a master of this court, with directions to apply the proceeds of sale as this decision requires.